Patricia Acosta, Esq.
Florida Bar No. 0615699
PAG Law, PLLC
1441 Brickell Ave., Suite 1120
Miami, FL 33131
Tel: (786) 292-1599
Email: patricia@pag.law

Andrew D. Zaron, Esq.
Florida Bar No. 965790
LEÓN COSGROVE JIMÉNEZ, LLP
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Tel: (305) 740-1975
Email: azaron@leoncosgrove.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | |
|---|---|
| In Re:<br><br>IIG Global Trade Finance Fund, Ltd.<br>(in Official Liquidation), et al.,<br><br>       Debtors in a Foreign Proceeding. | Chapter 15<br><br>Case No. 20-10132 (MEW)<br><br>Jointly Administered |

-------------------------------------------------------x

| | |
|---|---|
| IIG Global Trade Finance Fund Ltd.,<br>(in Official Liquidation) and IIG Structured<br>Finance Fund, Ltd. (in Official Liquidation),<br><br>       Plaintiffs,<br><br>   v.<br><br>San Agustin Energy Corp., Mid Summer Capital<br>Corp., Green Acres Development Ltd., Cloister<br>Blue Ltd., Lakeview Green Corp., Valle Energy<br>Inc.,<br><br>       Defendants. | Adv. Pro. No. 21-01092 (MEW) |

-------------------------------------------------------x

## SAN AGUSTIN ENERGY CORP.'S NOTICE OF APPEAL OF AMENDED JUDGMENT

Defendant San Agustin Energy Corp. ("San Agustin"), through undersigned counsel, hereby submits this notice of appeal under 28 U.S.C. § 158(a) of the Amended Judgment in the Adversary Proceeding dated July 7, 2023 [ECF No. 104]("Amended Judgment") and all orders subsumed thereby, including without limitation, the Decision on Parties' Motions for Summary Judgment dated April 27, 2023 [ECF No. 81]("Decision"). San Agustin attaches hereto the Amended Judgment and the Decision.

As set out herein, San Agustin files this notice of appeal in an abundance of caution. In particular, on May 11, 2023, San Agustin filed a notice of appeal of the of the original Judgment in the Adversary Proceeding dated April 27, 2023 [ECF No. 82]("Original Judgment"), commencing an appeal before the United States District Court for the Southern District of New York ("District Court"), styled *San Agustin Energy Corp., Appellant, v. IIG Global Trade Finance Fund Ltd. and IIG Structured Trade Finance Fund Ltd., Appellees*, Case No. 23-cv-4350(ER). The appeal of the Original Judgment is pending before Judge Edgardo Ramos.

On May 11, 2023, Plaintiffs filed their Motion for Costs and Fees [ECF No. 85]("Fee Motion") before the Bankruptcy Court, seeking fees and costs relating to its efforts in the adversary proceeding. Based on an agreement of the parties, the Bankruptcy Court entered (a) an order granting in part the Fee Motion [ECF No. 103]("Fee Order"), and (b) the Amended Judgment, which adds the fees and costs awarded to Plaintiffs to the amount of the Original Judgment. The Original Judgment and Amended Judgment are otherwise the same.

By this appeal of the Amended Judgment, San Agustin does not intend to expand the scope of its appeal of the Original Judgment. San Agustin files this appeal in an abundance of caution to clarify that it is not waiving its rights under the appeal of the Original Judgment. Furthermore, San Agustin will include on the civil cover sheet filed with this notice that this appeal is related to the appeal of the Original Judgment, and also include a related case statement. To the extent necessary,

it will file a motion to consolidate this appeal with the appeal of the Original Judgment to avoid any duplication of effort by the Court and any of the parties, or any delay in the appeal process.

The parties to the Amended Judgment and the Decision, and the addresses and telephone numbers of their respective counsel (if known), are as follows:

| PARTY | COUNSEL |
|---|---|
| IIG Global Trade Finance Fund Ltd. | John A. Pintarelli, Esq.<br>Patrick E. Fitzmaurice, Esq.<br>PILLSBURY WINTHROP SHAW PITTMAN LLP<br>31 West  52 Street<br>New York, NY 10019<br>Tel: (212) 858-1000 |
| IIG Structured Trade Finance Fund Ltd, | John A. Pintarelli, Esq.<br>Patrick E. Fitzmaurice, Esq.<br>PILLSBURY WINTHROP SHAW PITTMAN LLP<br>31 West  52 Street<br>New York, NY 10019<br>Tel: (212) 858-1000 |
| San Agustin Energy Corp. | Andrew D. Zaron<br>LEÓN COSGROVE JIMÉNEZ, LLP<br>255 Alhambra Circle, 8th Floor<br>Miami, Florida 33134<br>Tel: (305) 740-1975<br><br>Patricia Acosta<br>David Garcia-Pedrosa<br>PAG LAW, PLLC<br>600 Brickell Avenue, Suite 1725<br>Miami, FL 33131<br>Tel: (786) 292-1599 |
| Valle Energy, Inc. | Aleida Martinez-Molina, Esq.<br>Jeffrey Gutchess, Esq.<br>AXS Law Group, PLLC<br>2121 NW 2nd Avenue, Suite 201<br>Miami, Florida 33127<br>Tel: (305) 297-1878 |
| Lakeview Green Corp. | Aleida Martinez-Molina, Esq.<br>Jeffrey Gutchess, Esq. |

| | AXS Law Group, PLLC<br>2121 NW 2nd Avenue, Suite 201<br>Miami, Florida 33127<br>Tel: (305) 297-1878 |
|---|---|
| Cloister Blue Ltd. | Aleida Martinez-Molina, Esq.<br>Jeffrey Gutchess, Esq.<br>AXS Law Group, PLLC<br>2121 NW 2nd Avenue, Suite 201<br>Miami, Florida 33127<br>Tel: (305) 297-1878 |
| Green Acres Development Ltd. | Aleida Martinez-Molina, Esq.<br>Jeffrey Gutchess, Esq.<br>AXS Law Group, PLLC<br>2121 NW 2nd Avenue, Suite 201<br>Miami, Florida 33127<br>Tel: (305) 297-1878 |
| Mid Summer Capital Corp. | Aleida Martinez-Molina, Esq.<br>Jeffrey Gutchess, Esq.<br>AXS Law Group, PLLC<br>2121 NW 2nd Avenue, Suite 201<br>Miami, Florida 33127<br>Tel: (305) 297-1878 |

Dated:  July 21, 2023                    Respectfully submitted,


By: */s/ Andrew D. Zaron*
    Andrew D. Zaron
    Fla. Bar No. 965790
    LEÓN COSGROVE JIMÉNEZ, LLP
    255 Alhambra Circle, 8th Floor
    Miami, Florida 33134
    Tel: (305) 740-1975
    Email:  azaron@leoncosgrove.com


    Patricia Acosta
    Florida Bar No. 0614599

PAG Law, PLLC
1441 Brickell, Suite 1120
Miami, FL 33131
Tel. 786.292.1599 | Fax 786.373.7122
Email:  patricia@pag.law

*Attorneys for San Agustin Energy Corp.*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 21, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF or some other authorized manner.

*/s/ Andrew D. Zaron*
Andrew D. Zaron, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**IIG Global Trade Finance Fund Ltd. (in Official Liquidation),** *et al.*,<br><br>Debtors. | :    **Case No. 20-10132 (MEW)**<br>:<br>:    **Chapter 15**<br>:<br>:    **Jointly Administered**<br>: |
| **IIG Global Trade Finance Fund Limited (in Official Liquidation) and IIG Structured Trade Finance Fund Ltd. (in Official Liquidation),**<br><br>Plaintiffs,<br><br>v.<br><br>**San Agustin Energy Corp., Valle Energy, Inc., Lakeview Green Corp., Cloister Blue Ltd., Green Acres Development Ltd., Mid Summer Capital Corp.**<br><br>Defendants. | :    **Adv. Pro. No. 21-01092 (MEW)**<br>:<br>:    BC 23,0007<br>: |

## AMENDED JUDGMENT IN ADVERSARY PROCEEDING

The Court has ordered:

That judgment be, and hereby is, entered in favor of Plaintiffs IIG Global Trade Finance Fund Limited (in Official Liquidation) and IIG Structured Trade Finance Fund Ltd. (in Official Liquidation) against Defendant San Agustin Energy Corp. in the amount of $25,815,916.15, with post-judgment interest to accrue from April 27, 2023 at the federal judgment rate.

Dated: New York, New York
      July 7, 2023

                                                             <u>   Vito Genna   </u>
                                                            Clerk of the Court
                                                      <u> /s/ Anatin Rouzeau </u>
                                                            Deputy Clerk

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
In re                                       :
                                            :          Case No 20-10132 (MEW)
IIG Global Trade Finance Fund Ltd. (in      :
Official Liquidation), et al.,              :          Chapter 15
                                            :
                Debtors.                    :          Jointly Administered
-------------------------------------------------------------x
IIG Global Trade Finance Fund Limited (in   :
Official Liquidation) and IIG Structured    :
Trade Finance Fund Ltd. (in Official        :
Liquidation),                               :
                                            :
                Plaintiffs,                 :          Adv. Pro. No. 21-01092 (MEW)
                                            :
        v.                                  :
                                            :
San Agustin Energy Corp., Valle Energy, Inc.,:
Lakeview Green Corp., Cloister Blue Ltd.,    :
Green Acres Development Ltd., Mid Summer      :
Capital Corp.,                               :
                                            :
                Defendants.                 :
-------------------------------------------------------------x
```

<u>**DECISION ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT**</u>

A P P E A R A N C E S :

Pillsbury Winthrop Shaw Pittman LLP
New York, NY
*Attorneys for Plaintiffs*
    By:  John A. Pintarelli, Esq.
         Patrick E. Fitzmaurice, Esq.

León Cosgrove, LLP
Miami, Florida
*Co-Counsel for Defendant San Agustin Energy Corp.*
    By:  Andrew D. Zaron, Esq.

1

PAG Law, PLLC
Miami, Florida
*Co-Counsel for Defendant San Agustin Energy Corp.*
   By: Patricia Acosta, Esq.
       Alexandra Goodstone, Esq.

AXS Law Group, PLLC
Miami, Florida
*Attorneys for Defendants Valle Energy Inc., Mid
Summer Capital Corp., Green Acres Development
Ltd., Cloister Blue Ltd. and Lakeview Green Corp.*
   By: Jeffrey Gutchess, Esq.
     Aleida Martinez-Molina, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

     Plaintiffs IIG Global Trade Finance Fund Limited ("**GTFF**") and IIG Structured Trade Finance Fund Ltd. ("**STFF**"), as alleged assignees of an entity named Trade Finance Trust ("**TFT**"), have sued a number of defendants to recover outstanding loans. The defendants are San Agustin Energy Corp. ("**San Agustin**"), Valle Energy Inc. ("**Valle**"), Mid Summer Capital Corp. ("**Mid Summer")**, Green Acres Development Ltd. ("**Green Acres**"), Cloister Blue Ltd. ("**Cloister Blue**") and Lakeview Green Corp ("**Lakeview")**. For convenience, Mid Summer, Green Acres, Cloister Blue and Lakeview collectively are referred to herein as the "**Valle Subsidiaries,"** and together with Valle they are referred to as the "**Valle Defendants**."

     Count 1 of the First Amended Complaint alleges that TFT, San Agustin, Valle and Lakeview entered into an enforceable agreement in 2019 (the "**Fifth Amendment**") pursuant to which San Agustin assumed all of the borrowers' obligations under the relevant loans. Plaintiffs further allege that San Agustin has failed to repay the loans and that it should be required to pay the amounts owed plus interest and attorneys' fees. In the alternative, Plaintiffs allege in their second through fourth causes of action that if the Fifth Amendment were not effective then Valle

would still be obligated to repay all of the unpaid loans, and that the other defendants would be liable as co-borrowers or as guarantors with respect to some of those loans.

San Agustin contends that the Fifth Amendment was never validly executed and is not enforceable. It also questions the sufficiency of Plaintiffs' evidence on the issues of whether the lenders' rights belonged to TFT and were validly assigned to Plaintiffs. The Valle Defendants have argued that they were not given required notices of default under the relevant loan documents and that certain other defenses allegedly preclude Plaintiffs' claims.

Plaintiffs have moved for summary judgment in their favor with respect to all causes of action asserted in their First Amended Complaint. San Agustin has moved for summary judgment or, in the alternative, partial summary judgment as to claims based on the alleged effectiveness of the Fifth Amendment, and for summary judgment as to its alleged liability as a guarantor. The Valle Defendants contend that summary judgment against them is not proper as to any of the asserted claims.

The Court finds that the relevant facts are not in genuine dispute, and that the Fifth Amendment was validly executed by the parties and is enforceable. Plaintiffs therefore are entitled to the entry of summary judgment in their favor as to their first cause of action. The Court has calculated the outstanding interest as of the date of this Decision and will enter judgment in that amount in favor of Plaintiffs and against San Agustin. Any request by Plaintiffs to recover attorneys' fees should be made separately by a post-judgment motion. *See* Fed. R. Civ. P. 54(d), made applicable by Fed. R. Bankr. P. 7054.

The entry of summary judgment in favor of Plaintiffs with regard to the first cause of action (which is premised on the effectiveness of the Fifth Amendment) renders moot the Plaintiffs' claims against the Valle Defendants, because paragraph 7 of the Fifth Amendment provided that

the Valle Defendants would be released upon San Agustin's assumption of their obligations. In addition, the entry of judgment in favor of Plaintiffs with regard to the first cause of action renders moot Plaintiffs' alternative claims under the fourth cause of action, which asserted that even if the Fifth Amendment had not become effective San Agustin would still be liable as a guarantor of one of the underlying loans. For the sake of completeness, however, I have considered the parties' arguments with respect to these alternative claims. I find that even if the Fifth Amendment had not become effective Plaintiffs would be entitled to partial summary judgment in their favor against the Valle Defendants and San Agustin with respect to claims 2 through 4 of the First Amended Complaint, though in that case some additional proceedings would be needed to determine the exact amounts for which each of the various Defendants is liable.

### Facts Not Subject to Genuine Dispute

The parties submitted statements of the material facts that they did not believe were in genuine dispute (the "**Rule 7056 Statements**"), and they submitted responses and criticisms of each other's filings. They also submitted many exhibits in support of their respective contentions. In addition, some relevant evidence was submitted by the parties (with the Court's permission) after the initial Rule 7056 Statements and responses had been finalized, and after the Court raised certain questions during oral argument.

The Court has reviewed the evidence in detail. Many of the points of disagreement identified in the parties' submissions relate to background facts that are not relevant to the claims that are being asserted. Other points of disagreement relate only to the characterizations of certain facts. The key facts that are not in genuine dispute are set forth below.

## A.  Facts Regarding the March 2014 Loan Agreement

1.     Prior to March 2014, the Valle Subsidiaries agreed to acquire certain oil fields from Pacific Stratus Energy Colombia Corp. and Pacific Status International (together, "**Pacific Stratus**").  San Agustin (which was then known as Las Quinchas Resources Corp.) was an indirect subsidiary of Pacific Stratus.

2.     On March 10, 2014, Valle and its subsidiary, Lakeview, entered into a loan agreement (the "**March 2014 Loan Agreement**") with "IIG Capital, LLC, as agent for lender." The March 2014 Loan Agreement provided Valle and Lakeview with an uncommitted line of credit up to $10 million.  The March 2014 Loan Agreement was originally scheduled to mature on September 15, 2015.  Loans were to be repaid from the proceeds of the sale of oil produced from the oil fields that had been acquired, or were being acquired, from Pacific Stratus.  Paragraphs 10.1 and 10.2 of the March 2014 Loan Agreement permitted the Lender to assign its rights at any time and/or to sell participation interests in the loans.

3.     The Valle Subsidiaries guaranteed Valle's and Lakeview's obligations under the March 2014 Loan Agreement.  San Agustin also entered into a Conditional Guaranty of the prompt payment in full of the borrowers' obligations under the March 2014 Loan Agreement.

4.     On July 15, 2014, Valle and Lakeview (as borrowers), and IIG Capital, LLC, as agent, executed the First Amendment to the March 2014 Loan Agreement (the "**First Amendment**").  The First Amendment increased the available borrowings under the March 2014 Loan Agreement from $10 million to $16.5 million.  Each defendant reaffirmed its obligations under the loan documents and the guarantees, including San Agustin's obligations under the Conditional Guaranty.

5.      On October 20, 2014, Valle and Lakeview (as borrowers), and IIG Capital, LLC, as agent, executed the Second Amendment to the March 2014 Loan Agreement (the "**Second Amendment**").  The Second Amendment extended the maturity date of the loan to September 29, 2015.  Each defendant again reaffirmed its obligations under the loan documents and the guarantees, again including the Conditional Guaranty executed by San Agustin.

6.      On December 23, 2014, Valle and Lakeview, as borrowers, and IIG Capital, LLC, as agent, executed the Third Amendment to the March 2014 Loan Agreement (the "**Third Amendment**").  The Third Amendment provided that amounts previously repaid could be reborrowed.  Each defendant again reaffirmed its obligations under the loan documents and the guarantees, again including the Conditional Guaranty executed by San Agustin.

7.      On October 30, 2015, Valle and Lakeview, as borrowers, and IIG Capital, LLC, as agent, executed the Fourth Amendment to the March 2014 Loan Agreement (the "**Fourth Amendment**").  The Fourth Amendment extended the maturity date of the loans to October 31, 2016.  The borrowers agreed that they owed $16.5 million in principal and $175,885.43 in accrued interest under the March 2014 Loan Agreement.  Each borrower also acknowledged that it had no claims or defenses against the lender with respect to the loan, and waived any such claims or defenses.

8.      The March 2014 Loan Agreement, the Conditional Guaranty, the First Amendment, the Second Amendment, the Third Amendment and the Fourth Amendment did not name the lender for whom IIG Capital, LLC was acting as agent.

9.      The parties have agreed that the conditions to the effectiveness of the San Agustin Conditional Guaranty were satisfied (and that San Agustin thereby became a guarantor of the 2014 Loan) in November 2015, when Valle acquired all of the shares of San Agustin's immediate parent

company. As a result of that transaction, San Agustin became an indirect wholly-owned subsidiary of Valle.

**B.      Facts Regarding a Separate October 2014 Loan**

10.      Valle, as Borrower, entered into an uncommitted loan agreement dated as of October 30, 2014 with IIG TOF B.V. ("**TOF BV**") as lender (the "**October 2014 Loan Agreement**"). The October 2014 Loan Agreement provided Valle with the ability to borrow up to $4 million. *See* Zaron Decl., Ex. 8. The scheduled maturity date was November 30, 2016.

11.      The parties disagree as to whether the October 2014 loan was paid off or whether it was refinanced by the 2015 Loan Agreement that is described in paragraphs 12 and 13, below. However, the parties agree that the October 2014 loan was repaid sometime prior to the end of 2015 and that the October 2014 loan was not outstanding at any time after 2015.

**C.      Facts Regarding the 2015 Loan Agreement**

12.      On December 3, 2015, Valle, as borrower, entered into a loan agreement (the "**2015 Loan Agreement**") with TOF BV as lender. The 2015 Loan Agreement provided Valle with an uncommitted line of credit up to $4 million. The 2015 Loan Agreement was scheduled to mature on June 30, 2017. The Valle Subsidiaries and San Agustin were not guarantors of the 2015 loan, although the 2015 Loan Agreement refers to a pledge of stock that was granted in favor of the Lender. The 2015 Loan Agreement expressly allowed the Lender to assign its rights at any time and/or to sell participation interests in the outstanding loans.

**D.      Facts Regarding the Parties' Negotiations in 2016-2018**

13.      As noted above, the maturity of the March 2014 Loan Agreement had been extended to October 31, 2016 by the Fourth Amendment. The original maturity date of the 2015 Loan was June 30, 2017.

14.    The parties dispute the characterizations of discussions they had in 2016-18, and they dispute whether certain documents that were exchanged should accurately be described as "term sheets" regarding modifications of the outstanding loans.  However, there is no genuine dispute that in October 2016 and August 2017 the parties discussed possible amendments to the March 2014 Loan Agreement and the 2015 Loan Agreement.

15.    On October 20, 2016, IIG Trade Finance LLC proposed "a summary of the terms and conditions . . . for the subsequent subscription of the amendments of the two existing Valle Energy Inc. ('Valle') facilities."  The letter stated that the summary "does not attempt to describe all of the terms and conditions that pertain to the transaction amendments, nor do its terms suggest specific phrasing of documentation clauses, which final wording must be agreed by the parties."  The document was signed as "agreed to and accepted by" Valle Energy Inc.  However, it appears that no definitive documentation was executed at that time.

16.    On August 11, 2017, IIG Trade Finance LLC sent a "supplement" to a prior outline, which contemplated the consolidation of the outstanding loans into one new credit facility.  The document again stated that it "does not attempt to describe all of the terms and conditions that pertain to the transaction amendments, nor do its terms suggest specific phrasing of documentation clauses, which final wording must be agreed by the parties."  The document was signed as "agreed to and accepted by" Valle Energy Inc.  Once again, however, it appears that no definitive documentation was executed at that time.

17.    The 2018 financial statements of Valle and San Agustin state that San Agustin had assumed the obligations of Valle and Lakeview under the 2014 and 2015 Loan Agreements.  The date and manner of that assumption were not described.  However, a footnote to the financial

statements stated that the company was "in the process of formalizing the relevant documentation" with respect to this assumption of obligations.

### E.     Facts Regarding the Exchange of Executed Versions of the Fifth Amendment

18.     In 2019, the parties discussed a possible fifth amendment to the March 2014 Loan Agreement that would also amend the 2015 Loan Agreement and that would combine the two loans.

19.     By email dated September 11, 2019, Nathalia Torres, an attorney for San Agustin, confirmed that the defendants "agree with the latest version of the Fifth Amendment which contains the changes identified in the pdf document that was sent,"  and asked that the Fifth Amendment be signed on behalf of the lender.

20.     By email dated September 19, 2019, Nathalia Torres forwarded copies of minutes of the boards of directors of San Agustin and of San Agustin's parent corporation, each authorizing the execution of the Fifth Amendment.  The board minutes stated (among other things) that the Trade Finance Trust ("**TFT**") was the lender, by assignment, under both the March 2014 Loan Agreement and the 2015 Loan Agreement.

21.     On October 15, 2019, a representative of TFT forwarded to San Agustin's representative a copy of the Fifth Amendment executed on behalf of TFT, as lender.  The translation of the email that has been submitted by counsel to San Agustin states that the executed copy was being sent "[a]ccording to your request" and that "[w]e will be waiting for you to send the original documents duly executed of the Fifth Amendment, pledge, certificate of pledged stocks and minutes from the Board of Directors."

22.     By email dated November 1, 2019, a representative of San Agustin forwarded, to representatives of TFT, a copy of the Fifth Amendment executed on behalf of San Agustin, Valle

and Lakeview. The translation of the November 1, 2019 email that has been submitted by San

Agustin's counsel states as follows:

> I attach the Fifth Amendment, signed and authenticated by Sergio Abauat.
> Nathalia is preparing the package to send it to IIG in New York. However,
> since the maturity date agreed is immediate, and the company cannot
> cancel the amount of the credit, therefore, this will be immediately put in
> breach.
>
> In this situation, we insist that IIG approves a six-month extension, or
> longer, that we requested in previous days to cancel the credit, an
> extension that may be included in the text of the fifth amendment. We are
> sure that, in this period, we will be able to conclude a sale negotiation of
> the company that we have already arranged with a group in Houston or
> otherwise, to obtain financing to cancel the debt with IIG.

23. The parties have agreed that the version of the Fifth Amendment that was executed

and delivered by TFT (as referenced in paragraph 21), and the version of the Fifth Amendment

that was executed and delivered by San Agustin, Valle and Lakeview (as referenced in paragraph

22), are identical, except that:

A. The version executed by TFT bears the words "Execution Copy" on the top

right corner of each page;

B. The version executed on behalf of TFT states that is it dated "as of October

15, 2019," whereas the version executed on behalf of San Agustin states that it is dated "as

of October 28th, 2019;" and

C. The definition of "Fifth Amendment" on page 4 refers to an amendment

dated as of October 15, 2019 in the TFT version, and refers to an amendment dated as of

October 28th, 2019 in the San Agustin version.

*See* Tr., October 4, 2022, at 17.

24. Paragraph 30 of each of the executed versions of the Fifth Amendment that the

parties exchanged states that it "may be executed by the parties in several counterparts, each of

which shall be deemed to be an original and all of which shall constitute but one and the same agreement."

25.     Paragraph 27 of each executed version of the Fifth Amendment states that the Fifth Amendment "shall become effective as of the date of its signature."

26.     In paragraph 25 of each executed version of the Fifth Amendment the Borrower (San Agustin) represented and warranted that:

(a)     San Agustin had full power and authority and had taken all action necessary to execute and deliver the Fifth Amendment and all related documents to which it was a party and to perform its obligations, including the assumption of the Loan in the amount of $15.45 million; and

(b)     The Fifth Amendment and each related document "has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms."

27.     Each of the executed versions of the Fifth Amendment that the parties exchanged included an acknowledgment and agreement by the parties that TFT was "(a) the 2014 Lender under the March 2014 Loan Agreement by assignment from IIG Capital LLC, as Agent to the Lender, and (b) the 2015 Lender under the 2015 Loan Agreement by assignment from IIG TOF B.V., as agent to the Lender."

28.     Each executed version of the Fifth Amendment provided that (a) the 2015 Loan Agreement and March 2014 Loan Agreement would be amended and restated so as to constitute loans outstanding under the terms of the March 2014 Loan Agreement (as previously amended and as further amended by the Fifth Amendment) in the amount of $15,450,000 plus accrued interest, (b) that the combined loans would represent the "Loan" governed by the Fifth

Amendment, and (c) that San Agustin would assume all of Valle's and Lakeview's obligations under the loan agreements and would be the "Borrower" under the relevant credit documents.

29.    Each executed version of the Fifth Amendment stated that the interest rate on the Loan would be 11.5% per annum and that the Final Maturity Date would be October 31, 2019. The Fifth Amendment did not alter the provisions of the 2014 Loan regarding the payment of default interest at a rate that would be five percent (5%) higher than the base rate.

30.    Paragraph 27(d) of each executed version of the Fifth Amendment states that "[a]fter giving effect to this Fifth Amendment, no Default shall have occurred and be continuing[.]"

31.    Paragraph 29 of each executed version of the Fifth Amendment states that the agreement shall be governed by New York law, and includes a submission by the Borrower to the jurisdiction of state and federal courts in New York and the courts of Panama.

## F.    Facts Regarding Ownership of the Lender's Rights Under the March 2014 Loan Agreement as of October 2019

32.    As noted above, each of the executed versions of the Fifth Amendment that the parties exchanged included an express acknowledgment that TFT owned the lenders' rights under the 2014 and 2015 Loan Agreements.

33.    The parties agree that Trade Finance Funding I, Ltd. ("**TFFI**") at one point owned the lender's rights under the 2014 Loan Agreement.  More particularly:

(a)    Plaintiffs initially contended that TFFI had been the lender from the inception of the 2014 Loan Agreement.  After further investigation, however, Plaintiffs identified records showing that an entity named IIG Trade Opportunities Fund, N.V. ("**TOF NV**") was the initial lender, and that TFFI had paid $10 million to TOF NV in 2014

12

and had thereby become the lender "as assignee" respect to the March 2014 Loan Agreement. *See* Kennedy October 18 Decl., Exs 6, 7 and 8.[1]

(b)      During oral argument, San Agustin questioned whether TFFI had funded the additional amounts that were loaned pursuant to the various amendments to the 2014 Loan Agreement. Plaintiffs then produced additional records showing that TFFI had done so. *See* Kennedy October 19 Decl., Exs. 1-7.

(c)      By letter dated October, 18, 2022, counsel to San Agustin acknowledged that the documents described in subparagraphs (a) and (b) showed that TFFI owned the lender's rights under the 2014 Loan Agreement. However, San Agustin continued to question whether TFFI had later assigned those rights to TFT, and whether TFT had later assigned its rights to Plaintiffs GTFF and STFF. *See* Letter dated October 18, 2022 [Dkt. No. 75-2].

34.      The record shows that TFT purchased certain outstanding loans from TFFI pursuant to Purchase and Sale Agreements dated June 6, 2017 and July 3, 2017. *See* Kennedy Reply Decl., Ex. 5. The record also shows that at approximately the same times TFT entered into agreements to sell participation interests in certain loans to Plaintiffs GTFF and STFF. Among the relevant agreements were the following:

(a)      In June 2017, GTFF agreed to purchase participation interests from TFT in loans to "Valle Energy Inc." that were identified as being outstanding in the amount of

---

[1]      Plaintiffs submitted four separate declarations by Mr. Kennedy. The first, dated June 30, 2022, is cited herein as the "Kennedy Decl." The second, dated August 26, 2022, is cited as the "Kennedy Reply Decl." The third and fourth declarations, dated October 18, 2022 and October 19, 2022, are cited as the "Kennedy October 18 Decl." and the "Kennedy October 19 Decl.," respectively. San Agustin submitted a declaration by Andrew D. Zaron, dated June 30, 2022, that is cited herein as the "Zaron Decl."

$3,900,000 and that were described as being based on a loan agreement dated October 30, 2014.

(b)     Schedule 1 to the Purchase and Sale Agreement between TFT and TFFI dated June 6, 2017 includes, among the assets being assigned, the rights with respect to a loan to "Valle Energy Inc." under an agreement dated October 30, 2014 in the amount of $3,900,000.   This amount matches the $3.9 million total of the loans as to which participation interests were being sold to GTFF.

(c)     In June 2017, STFF agreed to purchase participation interests from TFT in loans to "Valle Energy Inc." that were identified as being outstanding in the amount of $9,950,000 and that were described as being based on a loan agreement dated as of October 30, 2014.

(d)     Schedule A to the agreement between TFT and TFFI dated July 3, 2017 listed, as a "subsequently conveyed asset," loans to Valle under the Fourth Amendment, in the amount of $9,950,000.   This amount matches the $9.95 million in loans as to which participation interests were being sold to STFF.

35.     The sum of the loans referenced in the GTFF and STFF participation agreement certificates was $13,850,000.   The sum of the Valle loans that TFFI transferred to TFT in the June 2017 Purchase and Sale Agreement and its July 2017 supplement also was $13,850,000.   The $13,850,000 total equaled the then-outstanding principal balance under the March 2014 Loan Agreement.   *See* Tr., October 4, 2022, at 37, 42, 45.

36.     Although the certificates for the participation interests sold to GTFF and to STFF refer to a loan agreement dated as of October 30, 2014, and although Schedule 1 to the Purchase and Sale Agreement dated June 6, 2017 similarly refers to an agreement dated as of October 30,

2014, the parties have agreed that the October 2014 loan was paid off prior to the end of 2015 and that no loan dated October 30, 2014 was outstanding as of June 2017. In addition, the July 3, 2017 agreement refers expressly to the "Fourth Amendment" in describing the $9.95 million portion of the Valle loans that was transferred at that time to TFT.

37.     The parties have not identified any loans to Valle that were owned by TFFI as of June 2017 except for the loans under the March 2014 Loan Agreement.

38.     San Agustin's financial statements for the years ended December 31, 2017 and December 31, 2018 refer to outstanding financial obligations in the total amount of $15,540,000 (the total amounts under the 2014 Loan Agreement and the 2015 Loan Agreement) and describe them as loans owed to TFT.

39.     Counsel to San Agustin, and counsel to the Valle Defendants, acknowledged during oral argument that they do not have evidence indicating that any entity other than TFT owned the Lenders' rights under the March 2014 Loan Agreement as of October 2019. *See* Tr., October 4, 2022, at 9-10, 32.

40.     San Agustin's counsel and the Valle Defendants' counsel also acknowledged during oral argument that since some time prior to October 2019 no parties other than TFT (and Plaintiffs as assignees of TFT) have requested payment by San Agustin or the Valle Defendants with respect to the March 2014 loan or (to the extent it is effective) with respect to sums due under the Fifth Amendment. *Id.* at 30-32.

41.     From some time prior to 2019, all negotiations and discussions that the defendants have had with respect to the 2014 Loan Agreement, the Fifth Amendment, and proposed modifications to the agreement, were with representatives of TFT or (following the further assignments described below) with representatives of Plaintiffs GTFF and STFF. *Id.*

15

G. **Facts Regarding Ownership of the Lender's Rights Under the 2015 Loan Agreement as of October 2019**

42.     In addition to the purchase described above in paragraph 35(c), STFF agreed in June 2017 to purchase participation interests from TFT in loans to "Valle Energy Inc." that were identified as being outstanding in the amount of $4,000,000 under a loan agreement dated October 30, 2014.

43.     The $4 million amount specified in the participation interests that were sold to STFF matched the principal amount that was then outstanding under the 2015 Loan Agreement.

44.     Plaintiffs have produced records indicating that funds provided by STFF were used by TFT to pay off a prior participation interest in the 2015 Loan Agreement that Bank Malta had purchased from TOF NV.

45.     Although the certificates for the participation interests sold to GTFF and to STFF refer to a loan agreement dated as of October 30, 2014, the parties have agreed that the October 2014 loan was paid off prior to the end of 2015 and that no loan dated October 30, 2014 was outstanding as of June 2017.

46.     Plaintiffs have not found operative documents showing an assignment of the 2015 Loan Agreement to TFT.  *See* Tr., October 4, 2022, at 44, 46, 48.  However, as noted above, the defendants expressly acknowledged (in the Fifth Amendment and in other documents) that TFT was the owner, by assignment, of the lender's rights under the 2015 Loan Agreement.

47.     San Agustin's financial statements for the years ended December 31, 2017 and December 31, 2018 refer to outstanding financial obligations in the total amount of $15,540,000 (the total amounts under both the 2014 Loan Agreement and the 2015 Loan Agreement) and describe them as loans owed to TFT.

48.     San Agustin's counsel and the Valle Defendants' counsel acknowledged during oral argument that they do not have any evidence indicating that any entity other than TFT owned the Lenders' rights under the 2015 Loan Agreement as of October 2019. *See* Tr., October 4, 2022, at 8-10, 32.

49.     San Agustin's counsel and the Valle Defendants' counsel acknowledged during oral argument that since some time prior to October 2019 no party other than TFT has requested payment by San Agustin or the Valle Defendants with respect to the 2015 Loan Agreement or (to the extent it is effective) with respect to sums due under the Fifth Amendment. *Id*. at 30-32.

50.     From some time prior to 2019, all negotiations and discussions that the defendants had with respect to the 2015 Loan Agreement, the Fifth Amendment, and proposed modifications to the agreement, were with TFT or (following the further assignments described below) with representatives of Plaintiffs GTFF and STFF. *Id.*

**H.     Facts Regarding the Proposed Modification Dated November 19, 2019**

51.     On November 6, 2019, a representative of TFT reported to others at TFT that Oscar Ordonez, on behalf of San Agustin, had stated during a telephone call that he would not release executed copies of a promissory note, stock pledge and officers' certificate unless and until TFT agreed to grant an extension of the maturity date as San Agustin had requested.

52.     On November 20, 2019, San Agustin's counsel sent a signed, proposed modified Fifth Amendment to TFT, along with the signed pledge agreement, an executed promissory note and an officers' certificate.  The proposed modified agreement that San Agustin sent on November 20, 2019 was identical to the versions of the Fifth Amendment that San Agustin, Valle and Lakeview had previously executed, except that:

(a)     this version of the amendment was dated as of November 19, 2019;

      (b)    the final maturity date was listed as April 30, 2020 rather than October 31, 2019;

      (c)    the definition of "Fifth Amendment" referred to an amendment dated as of November 19, 2019;

      (d)    a comma was deleted in a reference to a fee payment not to exceed $20,000; and

      (e)    a capital letter "T" was substituted for a lower case "t" in the phrase "the Lender" in section 27.

*See* Zaron Decl., Ex. 14.

53.    The executed promissory note that San Agustin forwarded on November 20, 2019 stated that San Agustin promised to pay, to TFT, the unpaid amounts reflected in "the Fifth Amendment dated as of November 19th, 2019."

54.    The executed officer's certificate that San Agustin forwarded on November 20, 2019 stated that the "Fifth Amendment, dated as of November 19th, 2019" had been duly authorized by prior directors' meetings and resolutions dated September 17, 2019.

55.    The modified version of the Fifth Amendment (with the extended maturity date) that San Agustin forwarded on November 20, 2019 was not executed on behalf of TFT.

**I.    Facts Regarding Subsequent Discussions**

56.    On November 21, 2019, the Securities and Exchange Commission filed a complaint against International Investment Group, Inc., an affiliate of TFT, alleging that the company had perpetrated a number of frauds that included the overvaluation of loan portfolios and the sale of participation interests in fictitious loans.

57.    GTFF and STFF were made the subject of winding-up orders in the Cayman Islands in October 2019.  Christopher Kennedy of Alvarez & Marsal Cayman Islands Limited was

appointed as an official liquidator of GTFF and of STFF by orders dated October 23, 2019 and January 31, 2020.

58.      Mr. Kennedy has submitted a sworn declaration stating that he did not know that TFT and San Agustin had exchanged executed copies of the Fifth Amendment as described in paragraphs 21 and 22, above.  San Agustin's counsel confirmed during oral argument that it does not contest this fact.

59.      IIG Trade Finance sent invoices addressed to Valle Energy dated December 1, 2019 and January 1, 2020 that charged interest at the rate of 12.5%, rather than interest at the reduced 11.5% ordinary interest rate that the executed versions of the Fifth Amendment called for or the higher default rate that the executed versions of the Fifth Amendment called for.

60.      San Agustin made payments under the 2014 Loan Agreement and the 2015 Loan Agreement even prior to October 2019.  After October 2019, San Agustin made three payments to TFT in the amounts of $170,000 each on November 5, 2019, December 2, 2019 and January 3, 3020.  No further payments with respect to the relevant loan(s) have been made.

61.      On February 25, 2020, Max Jackson, an associate with Alvarez & Marsal Cayman Islands Limited, sent an email to Mr. Kennedy that attached a marked-up copy of the modified version of the Fifth Amendment that San Agustin had sent in November 2019.  The email stated that the attached draft was the "most up to date draft we have received (we expect DH to provide the final version per the meeting on Thursday) of the 5th amendment to the Valle Energy (aka San Agustin) loan, which per DH will need to be executed in the coming weeks."

62.      On March 11, 2020, David Hu, a co-founder of the IIG companies, sent an email to the chief financial officer of San Agustin, stating that GTFF and STFF were being liquidated and that Mr. Kennedy and Alvarez & Marsal would  be responsible for that liquidation.  On that same

date, Mr. Kennedy stated he would be willing to continue negotiations regarding a potential amendment. It is unclear whether Mr. Hu had any continued involvement in the parties' discussions after that date. So far as the record shows, it appears that defendants' subsequent discussions were with Mr. Kennedy.

63. On April 20, 2020, a representative of San Agustin informed Mr. Kennedy that San Agustin had not yet received "our original document from the Fifth Amendment nor the documents related and duly executed by IIG, which were sent to IIG months ago." The email also stated that pursuant to the Fifth Amendment interest should only be invoiced at the rate of 11.5%, rather than at the rate of 12.5% that had appeared in invoices that were sent. In response, Mr. Kennedy stated that he would look into the matters that had been raised, and asked in the interim that defendants pay interest at the 11.5% rate set out in the Fifth Amendment.

64. On June 5, 2020, Mr. Kennedy advised San Agustin that he (as liquidator) would not sign the version of the Fifth Amendment that San Agustin had sent to him, on the ground that "[h]ad that document been signed by IIG it would have expired some months ago." Instead, Mr. Kennedy suggested that the parties put a new agreement in place.

65. On July 17, 2020, an information was filed against David Hu, a co-founder of International Investment Group. The information alleged that Mr. Hu had defrauded GTFF, STFF and another fund by selling interests in overvalued loans and some fake loans. On January 18, 2021, Mr. Hu entered a plea of guilty to these charges.

66. In approximately January 2021, Valle and San Agustin issued 2020 and 2019 financial statements that reflected a purported reversal of San Agustin's prior assumption of Valle's obligations to TFT.

J.      **Facts Regarding the TFT Assignment to Plaintiffs**

67.     TFT, GTFF and STFF entered into an assignment agreement in 2020 (the "**2020 Assignment**") that was approved by this Court by order dated October 8, 2020.

68.     Schedule 4 to the 2020 Assignment recognized that GTFF and STFF held participation interests in $15,450,000 principal amount of loans to "Valle Energy Inc." As noted above, at the time the participation interests were acquired Valle was the named borrower. The $15,450,000 principal amount equals the principal amount that was outstanding under the Fifth Amendment.

69.     Pursuant to the 2020 Assignment, TFT agreed to assign to GTFF and STFF all of TFT's "right, title, and interest in, to and under the Facilities and Loans" identified in the schedules to the 2020 Assignment, including Schedule 4.

## Discussion

Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a finder of fact "reasonably" could find in favor of the non-moving party. *Id.* A party opposing summary judgment may successfully defend against such a motion by showing that the moving party cannot produce admissible evidence that is sufficient to carry its burden of proof as to a material fact. *See* Fed. R. Civ. P. 56, Advisory Committee Note of 2010. However, if the movant has identified evidence that is sufficient to carry its burden, then the party opposing summary judgment must identify evidence that would reasonably permit a fact-finder to make a contrary finding after a trial. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d. Cir.

2011). In this regard, the nonmoving party may not rely on mere denials or unsubstantiated

speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998). Nor may a party opposing

summary judgment rely solely on "some metaphysical doubt as to the material facts." *Matsushita*

*Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Furthermore, if the evidence offered by the nonmoving party is "merely colorable," or "is

not significantly probative," then "summary judgment may be granted." *Liberty Lobby,* 447 U.S.

at 249-50. A trial is only required when "reasonable" minds could differ as to the import of the

evidence. *Id.* at 251. Accordingly, summary judgment is proper where the evidence is such that

it "would require a directed verdict for the moving party." *Id.* (*quoting Sartor v. Arkansas Gas*

*Corp.*, 321 U.S. 620, 624 (1944)).

## I.    The October 2019 Executed Versions of the Fifth Amendment <u>Formed A Valid and Binding Contract.</u>

The parties disagree as to the consequences of their exchanges of signed versions of the

Fifth Amendment in October 2019, but the underlying facts are not in genuine dispute.

Each of the executed versions of the Fifth Amendment that the parties exchanged stated

that the amendment would be governed by New York law. The parties agree that New York law

permits contracts to be executed in counterparts. Paragraph 30 of each executed version of the

Fifth Amendment expressly acknowledged that it could be executed in counterparts.

San Agustin at one point questioned whether the version of the Fifth Amendment that was

executed on its behalf in October 2019 had been properly authorized, but San Agustin withdrew

that contention after the parties identified and produced a translated copy of board minutes that

had expressly authorized the execution and delivery of the Fifth Amendment. *See* Tr., October 12,

2022, at 8. Similarly, at one point San Agustin disputed whether there was consideration for the

Fifth Amendment, but San Agustin's counsel acknowledged during oral argument that San Agustin had dropped that contention.  *See* Tr., October 4, 2022, at 18.

To be sure, there were minor text differences between the executed versions of the Fifth Amendment that the parties delivered to each other.  One (the version executed by TFT) included the heading "Execution Version," whereas the other (the version executed by San Agustin) did not include that heading.  In addition, the parties inserted different "as of" dates in the versions of the Fifth Amendment that they executed.  There are no factual disputes to be resolved regarding those differences, however.  The only real question is the legal issue of whether the documents were sufficient to create a binding contractual obligation notwithstanding the minor differences that appeared.

Plaintiffs have contended that the minor differences between the executed counterparts do not affect the enforceability of the agreement so long as the differences are immaterial.  San Agustin has not disputed that legal proposition, or offered any contrary authority.  The Court notes that there is a somewhat surprising lack of prior authority regarding the effect of minor differences between executed counterparts to a contract.  On the other hand, courts have often held that immaterial differences between a contract offer and a contract acceptance do not give rise to a "counteroffer" but instead operate to bind the parties to an enforceable contract.  *See, e.g., O'Hearn v. Gormally (In re Gormally)*, 550 B.R. 27, 38-39 (Bankr. S.D.N.Y. 2016) (holding that immaterial deviations between an offer and an acceptance do not give rise to counteroffers but rather operate to bind the parties to an enforceable contract).  By analogy, where the parties agree to execute counterparts to a contract, and then exchange the executed counterparts, immaterial textual differences between those counterparts should not bar the formation of a contract.

San Agustin's argument in response is that the different "as of" dates in the two versions of the Fifth Amendment are material (not immaterial) because they allegedly would result in different "effective" dates for the agreement.  Since the agreement provided for a reduction in the interest rate, San Agustin contends that the different effective dates would result in different interest calculations.  *See* Tr., October 4, 2022, at 62.  San Agustin's argument is without merit, however, because the "as of" dates listed in the different versions that the parties signed are *not* identified in the documents as the "effective date" of the Fifth Amendment.  Instead, paragraph 27 of each signed version of the Fifth Amendment states that the amendment will be effective as of "the date of its signature."  There is nothing in the amendment that required the parties to sign the amendment on the same date; in fact, the parties' email correspondence makes clear that they expected to sign the amendment on different dates, as San Agustin asked TFT to forward a signed copy of the amendment prior to the time when San Agustin intended to execute and return a separate counterpart.  It is indisputable that October 28, 2019 was the date by which both parties had executed and delivered the Fifth Amendment.  Since October 28, 2019 was the date by which signatures had been completed, October 28, 2019  was the agreed "effective date" of the amendment according to its plain terms.

In addition, when San Agustin's counsel argued that somehow there was an "ambiguity" as to whether the effective date of the amendment should be deemed to be October 15, 2019 (the date on which TFT executed its counterpart) – even though San Agustin admittedly did not sign the amendment until October 28, 2019 – Plaintiffs' counsel agreed that the "effective date" could be deemed to be whatever signature date would most benefit San Agustin, which in this case would be the October 15, 2019 date.  *See* Tr., October 4, 2022, at 61-2.  As noted below, Plaintiffs have incorporated that concession into their damage calculations.  When asked (in light of this

concession) how the different "as of" dates could have had any "material" consequence, San Agustin's counsel was unable to answer. *Id.* at 64.

San Agustin's counsel made other arguments in an effort to stave off the effectiveness of the Fifth Amendment, but they do not raise genuine disputes as to material facts.

### A.      Whether a Cover Email Suggests No Intent to be Bound

When San Agustin forwarded its executed copy of the Fifth Amendment it did so with a cover email that expressed a desire to agree to additional amendments, noting that the stated maturity date (October 31, 2019) was only days away and that San Agustin would be unable to make payment on that schedule.  More specifically, the email stated:

> I attach the Fifth Amendment, signed and authenticated by Sergio Abauat. Nathalia is preparing the package to send it to IIG in New York.  However, since the maturity date agreed is immediate, and the company cannot cancel the amount of the credit, therefore, this will be immediately put in breach.
>
> In this situation, we insist that IIG approves a six-month extension, or longer, that we requested in previous days to cancel the credit, an extension that may be included in the text of the fifth amendment.

San Agustin contends that this email somehow indicates an intent not to be bound by the signed Fifth Amendment that was being forwarded with the email.

San Agustin's contention makes no sense.  The cover email sent by San Agustin states that the enclosed copy of the Fifth Amendment had been "signed" and "authenticated."  The email does not express any doubt as to the enforceability or binding nature of the amendment, or any intent not to be bound by it.  If San Agustin really had not intended to be bound by the Fifth Amendment, then it would not have signed it and delivered it at all.  Instead, San Agustin delivered the signed amendment, and the covering email refers to the "agreed" maturity date as being "immediate."

San Agustin also acknowledged that it has no evidence (in the form of testimony by the author of the email or otherwise) to the effect that San Agustin did not intend its executed copy of

the Fifth Amendment to be binding upon it.  (October 4 Tr. at 85-6.)  In fact, such a contention is

foreclosed by the executed copy of the Fifth Amendment that San Agustin delivered.  Paragraph

25 of the signed Fifth Amendment includes express representations and warranties by San Agustin

that the Fifth Amendment had been "duly executed and delivered by it and *constitutes its legal,*

*valid and binding obligation, enforceable in accordance with its terms*."  (Emphasis added.)  San

Agustin's argument that it did not intend to be bound is contrary to that plain language.

In context, the cover email can only be interpreted as an expression of a desire to negotiate

a further amendment, and not as a lack of intent to be bound by the signed amendment that was

being forwarded by the same email.  That request for a further amendment does not undermine the

validity of the Fifth Amendment.  As noted in the *Williston* treatise:

> Frequently an offeree, while making a positive acceptance of the offer, also
> makes a request or suggestion that some addition or modification be made.  So
> long as it is clear that the offeree is positively and unequivocally accepting the
> offer, regardless of whether the request is granted or not, a contract is formed.
> Thus, a request for a modification of the offer coupled with an otherwise
> unqualified acceptance, which does not depend on the offeror's assent to the
> requested change, operates as an acceptance, and a contract is thereby formed.

*Williston on Contracts 4th*, § 6.16; *see also* Restatement (Second) of Contracts § 61 (1981) ("[a]n

acceptance which requests a change or addition to the terms of the offer is not thereby invalidated

unless the acceptance is made to depend on an assent to the changed or added terms").

### B.     San Agustin's Failure to Forward Other Documents Did Not Alter the Effectiveness of the Fifth Amendment

The Fifth Amendment contemplated that additional documents (including a promissory

note, an officer's certificate and a pledge agreement) would be executed and provided by San

Agustin.  The record shows that San Agustin represented that such documents were being

"prepared" and would be sent to New York.  Subsequently, however, San Agustin took the position

26

that it would not provide these extra materials unless TFT agreed to a further extension of the maturity date.

San Agustin argues that the delivery of these additional documents were conditions to the effectiveness of the Fifth Amendment, and therefore that the Fifth Amendment cannot be enforced. It is true that the effectiveness of some of the earlier amendments to the March 2014 Loan Agreement were conditioned on the delivery of similar documents. However, the Fifth Amendment has different terms. Paragraph 27 states that the Fifth Amendment was effective when it was "signed" by the parties. It goes on to state that San Agustin will provide additional documents, but the delivery of those documents is not described as a condition to the effectiveness of the amendment. Instead, the amendment is effective when signed, and the obligation to deliver the documents just became one of the contractual obligations that San Agustin was obliged to perform.

During oral argument, San Agustin's counsel contended that it would have made more sense for the lender to insist that all of the required additional documents be provided before the amendment could become effective. Tr., October 4, 2022, at 67. But the Court's duty is to interpret and enforce the agreement in accordance with its plain language, and under its plain terms the effectiveness of the Fifth Amendment was not conditioned upon the receipt of such documents.

### C. Whether TFT Owned the Lenders' Rights under the March 2014 Loan Agreement and the 2015 Loan Agreement

San Agustin has contended that TFT has not offered sufficient evidence that it was the owner of the lenders' rights under the 2014 Loan Agreement and the 2015 Loan Agreement as of October 2019. This argument has been asserted primarily with respect to Plaintiffs' alternative claims, under which Plaintiffs argue that even if the Fifth Amendment were not effective Plaintiffs would be entitled to judgment against San Agustin based on its Conditional Guaranty. During oral

argument, however, San Agustin contended that this issue somehow also would affect the rights of TFT to enforce the Fifth Amendment itself.

The Fifth Amendment states in the clearest possible terms, however, that San Agustin is obligated to make payments to TFT – not to any other party. San Agustin also acknowledged in the amendment (and in other documents, as noted above) that TFT was the owner of the lenders' rights. No evidence was needed to prove San Agustin's obligation to make payments to TFT following the execution of the Fifth Amendment, because that is precisely what the Fifth Amendment required San Agustin to do.

During oral argument, counsel to San Agustin contended that Mr. Hu and others at IIG had been accused of fraud, and so maybe they had lied about TFT's ownership of the loans in advance of the execution of the Fifth Amendment. *See* Tr., October 4, 2011, at 28-30. However, counsel acknowledged that San Agustin had not pleaded fraud as a defense to any of the claims asserted by Plaintiffs. *Id.* at 30. More importantly, counsel also acknowledged that San Agustin has no evidence that any fraud had been committed in this regard, and that it has no evidence that anyone other than TFT owned the lenders' rights at the time of the Fifth Amendment. *Id.* at 34.

Counsel's idle speculation about possible fraud does not give rise to a genuine dispute that requires a trial. There is no evidence upon which "fraud" could be found or upon which San Agustin's own prior admissions about TFT's ownership of the Lenders' rights should or could be undone. As the Supreme Court has held, an expression of metaphysical doubt by a party, without evidence, is not enough to overcome a summary judgment motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

TFT is not required to prove anything more than the terms of the Fifth Amendment itself in order to have to right to collect the loans and to enforce rights under the loan agreements. In

any event, even if Plaintiffs were obligated to show that TFT owned the Lenders' rights as of the

date of the Fifth Amendment, I find for the reasons set forth below (in connection with Plaintiffs'

alternative claims) that there is no genuine issue as to TFT's ownership of the Lenders' rights.

> **D.      Actions and Statements by Mr. Kennedy (Who Did Not Know of the October 2019 Exchanges of Executed Counterparts) Do Not Undermine the Validity of the Fifth Amendment.**

Finally, San Agustin attempted to argue that certain actions or statements by Mr. Kennedy

allegedly showed that the October 2019 exchanges of counterparts were not sufficient to form a

contract.  However, Mr. Kennedy was not an official of TFT.  He was appointed as a liquidator of

STFF and GTFF, and he has testified (and San Agustin has not contested) that he did not even

know about the October 2019 exchange of signed counterparts until after this lawsuit was filed

and after the counterparts were unearthed during the course of discovery.  His actions and

statements in 2020 – at a time when he was not even aware of the October 2019 exchange – cannot

reasonably be taken as "admissions" of any kind as to whether the October 2019 exchange had

been sufficient to establish a binding agreement.

## II.      There Is No Genuine Dispute That TFT Assigned its Rights to Plaintiffs

In 2020, GTFF and STFF entered into an agreement pursuant to which TFT assigned

various rights to GTFF and STFF.  GTFF and STFF contended that they owned participation

interests in various loans, and in respect to those loans TFT agreed to assign all of its right, title

and interest in, to and under such Loans.  San Agustin has argued that the Assignment Agreement

only applies to loans in which GTFF and STFF actually owned participation interests, and it has

questioned whether GTFF and STFF owned participation interests in the March 2014 Loan

Agreement and the 2015 Loan Agreement, as modified by the Fifth Amendment.  However, there

are two separate reasons why this argument does not raise a genuine issue for trial.

First, although the Assignment Agreement recites the fact that GTFF and STFF believed they held participation interests in the relevant loans, the effect of the assignment (and the identification of the rights that were assigned) do *not* depend on the validity of those participation interests.  Instead, the Assignment Agreement states clearly that TFT "irrevocably sells, assigns, grants, conveys and transfers to the Assignees . . . all of Assignor's right, title, and interest in, to and under the Facilities and Loans in the amounts identified in Schedules 1, 2, 3 and 4 hereto . . .," along with "all legal and equitable rights and claims related to the foregoing."  Kennedy Decl., Ex. 29.  No conditions or limitations to that assignment were set forth.  By the plain terms of that agreement (which this Court approved), GTFF and STFF own "all" of TFT's rights, as Lender, with respect to the loans listed on the attachments to the agreement.  *See* Kennedy Decl., Ex. 31.

Second, even if GTFF and STFF were required to show that they owned valid participation interests in the relevant loans, the Court finds, for the reasons stated below with respect to Plaintiffs' alternative claims, that there is no genuine issue of fact as to the validity of those participation interests or as to the loans to which they are applicable.

San Agustin has also questioned whether the Assignment Agreement covers the entirety of the loans encompassed by the Fifth Amendment.  In this regard, the first three schedules to the Assignment Agreement (which list certain loans that were assigned to TFT at various times) do not refer to the amounts loaned under the 2015 Loan Agreement.  However, Schedule 4 to the Assignment Agreement plainly lists outstanding loans to Valle Energy Inc. in the total principal amount of $15,540,000, which corresponds exactly to the total amount that was outstanding under the 2014 and 2015 loans that was consolidated through the Fifth Amendment.  The mere fact that the Schedule refers to "Valle" as the borrower is not enough to create a dispute requiring a trial.  Schedule 4 is described in the agreement as a schedule of loans in which Plaintiffs held

participation interests, and Valle was the named borrower at the time those participation interests were sold. In addition, the motion that accompanied the request for approval of the Assignment Agreement made clear that the loans to "Valle" that were referenced in Schedule 4 were loans that had originally been made to Valle and that San Agustin had assumed. *See* Kennedy Decl., Ex. 30. Valle and San Agustin have also acknowledged that from and after October 1, 2019 there were no outstanding loans that Valle and San Agustin owed to TFT (or to any other IIG-affiliated entity) other than the loans in the outstanding principal amount of $15,540,000 that are covered by the Fifth Amendment.

Plaintiffs' evidence is sufficient to carry their burden of showing that TFT's rights were assigned to Plaintiffs, and San Agustin has admitted that it has no evidence to the contrary. No reasonable person could find, based on the evidence, that TFT failed to assign its rights to Plaintiffs, or that the reference to "Valle" loans in the amount of $15.54 million in Schedule 4 covers anything other than the loans covered by the Fifth Amendment.

**III.    The Evidence Does Not Support Defendants' Contentions That Plaintiffs Breached Their Obligations in any Manner that Would Free Defendants From Their Obligations**

The Defendants have argued that TFT did not "perform" under the Fifth Amendment. It appeared that these arguments initially were made in response to arguments over whether the modified version of the Fifth Amendment that San Agustin proposed in mid-November 2019 might have become effective by "performance" rather than by signature. The same arguments were asserted, however, in support of contentions that the parties allegedly did not intend to be bound by the executed copies of the Fifth Amendment that were exchanged in October 2019 – a contention which, as noted above, is barred by the plain language of the amendment itself. Defendants also asserted the same arguments in support of contentions that TFT and Plaintiffs

allegedly breached the Fifth Amendment in ways that should bar them from collecting the loans that are owed. There is no merit to these contentions about alleged breaches, for a number of reasons.

### A.   Interest Invoices and Charges

Defendants contend that TFT improperly sent invoices after October 31, 2019 that sought interest payment at the rate of 12.5% rather than 11.5%. Plaintiffs acknowledge that this occurred. However, the undisputed facts are that San Agustin only made two payments after the date of the Fifth Amendment, and it did so without complaint. It is true that Defendants later raised questions of Mr. Kennedy regarding the interest rates, but at that time Defendants refused to pay even the 11.5% interest that they admitted was owed.

An action is not a material breach that excuses performance by the other party unless it goes to the heart of the parties' obligations. *See Process Am., Inc. v Cynergy Holdings, LLC*, 839 F.3d 125, 136-37 (2d Cir. 2016) (to excuse performance, a breach "must go to the root of the agreement between the parties"); *Septembertide Pub., B.V. v Stein and Day, Inc*., 884 F.2d 675, 678 (2d Cir. 1989) (same). Here, Defendants owed a debt. It is preposterous to suggest that an incorrect invoice is a "breach" of such magnitude that it should relieve the Defendants of the debts that they owe. In fact, when asked why an incorrect interest charge should be considered a "breach" of a loan agreement, counsel to San Agustin was unable to answer. October 12 Tr. at 56-7. Similarly, when asked why an incorrect interest invoice should excuse the entire remaining debt, counsel was unable to provide an answer. *Id*. at 99-102.

Even if interest had ever been overcharged, the correct remedy would have been to adjust the amount that remains owing under the loans, not to bar the collection of the loans. In fact, though, the record shows that interest was undercharged, not overcharged. The parties were

engaged in discussions about a possible further extension after October 2019, and the invoices that were sent did not purport to charge default interest. However, Plaintiffs now seek default interest from and after the agreed October 31, 2019 maturity date of the loans. In fact, 12.5% was significantly *less* than the default interest that actually was owed (16.5%) once the loans matured.

Counsel to San Agustin argued that the fact that invoices asked for 12.5% interest payments somehow should deprive Plaintiffs of the right to collect default interest at all, but I am at a loss to understand how this could or should be the case.

## B.     Sending Invoices to Valle

Defendants argue that some post-October 2019 invoices were addressed to Valle. However, the parties conceded that the individual whose name was listed was also an employee of San Agustin, and that San Agustin was the only entity that made payments. Tr., October 4, 2022, at 96-98; Tr., October 12, 2022, at 23-24. Defendants argued that the addressing of the invoices somehow constituted a "breach" of the parties' agreements, but when asked during oral argument how the invoice address could conceivably have constituted a "breach" the Defendants' attorneys could not answer. Tr., October 4, 2022, at 97.

## C.     TFT's Alleged Failures to File UCC Statements

Defendants argued that TFT had failed to file UCC statements reflecting the substitution of San Agustin as borrower. However, Defendants were unable to explain how or why a failure to file such UCC statements (which were designed to protect the lender's rights) could have constituted a "breach" by the lender that would have excused Defendants' performance of any of their obligations. Tr., October 12, 2022, at 104.

### D. The Failure to Release Subsidiary Guarantors

Defendants contend that the Fifth Amendment required TFT to release the Valle Subsidiaries from their guarantees and that TFT did not do so. In fact, the Fifth Amendment required TFT to release the subsidiary guarantors upon the "request" of the Valle Subsidiaries, and Defendants' counsel admitted during oral argument that the Defendants made no such request until Mr. Solano mentioned it in an email to Mr. Kennedy in 2020. Tr, October 4, 2022, at 77. As noted above, the parties agreed that Mr. Kennedy did not even know that the parties had exchanged signed counterparts of the Fifth Amendment in October 2019; so far as he knew in 2020, any provision in the Fifth Amendment calling for a release of guarantors was just a proposal. In context, his failure to release guarantors indicates nothing other than his lack of knowledge of the October exchange.

In any event, Defendants acknowledged that they could not identify any prejudice to them resulting from the alleged failure to provide a formal release of the prior guarantees. Tr., October 12, 2022, at 103. Nor is there any conceivable basis on which the primary obligor under the Fifth Amendment (San Agustin) should be freed of its obligations based on alleged failures to provide formal releases to the Valle Subsidiaries from their separate guarantees.

### E. Mr. Kennedy's Alleged "Admissions" of Defaults

On June 3, 2020, Mr. Kennedy sent an email to San Agustin (Zaron Decl., Ex. 32) in which he stated that "[i]t is important for your business and for us to cure all of the outstanding breaches and agree [on] a revised loan extension." In its papers, San Agustin repeatedly cited to this email as though it were an admission by Mr. Kennedy that the lender was in material breach of its own obligations under the Fifth Amendment. The email says nothing of the kind. It says it is important "for us" that breaches be cured, but there is no indication that any of those breaches were by the

34

lender itself. In any event, as noted above the matters cited by Defendants show nothing more than minor sloppiness. They do not constitute breaches that would bar the enforcement and collection of the loans and/or the enforcement and collection of default interest.

## IV. Plaintiffs' Alternative Claims Regarding the November 2019 Proposal

Plaintiffs have argued, in the alternative, that if the exchange of executed counterparts of the Fifth Amendment in October 2019 were not sufficient to form a contract, then the November 2019 draft forwarded by San Agustin allegedly could be enforced on the theory that it was accepted by "performance." This contention is moot in light of the Court's holdings regarding the effect of the exchange of executed counterparts in October 2019. For the sake of completeness, however, the Court notes that the November 2019 proposed revision to the terms of the Fifth Amendment states that it is effective only upon its signature, and the parties have agreed that it never was signed on behalf of TFT. *See* Tr., October 4, 2022, at 20. That is sufficient by itself to preclude enforcement of the November 2019 proposed revision of the Fifth Amendment. *See Naderi v. North Short-Long Is. Jewish Health Sys.*, 135 A.D.3d 619, 620 (1st Dept. 2016) (where agreement required a signature to be effective and it was not signed, the agreement did not take effect).

In their papers, Plaintiffs also contended that the promissory note that San Agustin sent in November 2019 could be separately enforced. However, that note referred expressly to obligations under a version of the Fifth Amendment that admittedly was never signed and therefore never became effective. Plaintiffs withdrew this particular contention during oral argument. *See* Tr., October 12, 2022, at 26.

## V. Plaintiffs' Alternative Claims Based on the 2014 and 2015 Loan Agreements.

Plaintiffs also contend that even if the Fifth Amendment were not effective the Defendants would still be liable with respect to the underlying March 2014 Loan and the 2015 Loan. Those

alternative claims are moot to the extent that the Fifth Amendment is effective. For the sake of completeness, however, I note that Plaintiffs would be entitled to summary judgment on these alternative claims even if the Fifth Amendment were not valid.

Defendants' primary ground for opposition to the alternative claims is their contention that Plaintiffs have not sufficiently proved that TFT owned the lenders' rights and that TFT validly assigned those rights to Plaintiffs. Defendants' attorneys have openly acknowledged, however, that they have no evidence at all that suggests that TFT did not own the lenders' rights, or that anyone other than Plaintiffs owns the lenders' rights as of today. As explained below the Plaintiffs have offered sufficient proof to carry their burden on these points, and Defendants have failed to show that there is a genuine dispute over these matters that requires a trial.

Defendants have also sought to interpose a host of defenses based on alleged lack of notice, alleged waivers, and other contentions that lack factual or legal support.

### A.  TFT's Ownership of the Lender's Rights Under the 2014 Loan Agreement

Certain facts that are not in genuine dispute regarding the ownership of the Lender's Rights under the 2014 Loan Agreement are set forth in paragraphs 32-41 on pages 12-15, above. As indicated there, Plaintiffs have produced evidence showing that TIFF became the lender under the March 2014 Loan Agreement in 2014; that TIFF funded the initial $10 million advance and the additional advance that was later made under the amended terms of the agreement; and that TIFF assigned the lenders' rights to TFT in June 2017. Even if the Fifth Amendment were not effective as a legal matter, the fact remains that the Defendants acknowledged TFT's ownership of the lenders' rights in the financial statements that Defendants prepared for 2017 and 2028, in the documents that they signed in 2019, in the board resolutions that were passed in 2019, in the payments that Defendants made both before and after October 2019, and in all of their negotiations

over the loans in 2019 and thereafter. Furthermore, as noted above the Defendants have acknowledged that no other party (other than TFT and then Plaintiffs) has attempted to assert the lenders' rights since 2017. Defendants have further acknowledged that they have no evidence to offer that would suggest that TFT did not acquire the lenders' rights from TIFF and/or that TFT did not still own the lenders' rights at the time it entered into the Assignment Agreement with Plaintiffs.

Defendants have argued that one of the two assignment agreements between TIFF and TFT referred to a loan agreement dated October 30, 2014. However, it is agreed that no loan dated October 2014 was actually outstanding at the time. The supplemental assignment from TIFF to TFT in July 2017 plainly referred to the "Fourth Amendment," and the amounts that were assigned from TIFF to TFT under the two assignments ($13,850,000) exactly equaled the amount then outstanding under the March 2014 Loan Agreement. There were no other loans to Defendants that TIFF owned and that could possibly have been intended by these references. In context, the minor error in listing the description of the date of the loan agreement does not raise a genuine issue for trial.

Defendants' counsel noted during oral argument that TFT's principals were later accused of fraud in connection with some of their sales of participation interests, and speculated that the assignments from TIFF to TFT also might have been fraudulent. However, as noted above no other party has sought to enforce the lender's rights since 2017. Presumably if someone else owned those rights they would have sought repayment. Defendants also admitted that they have no evidence to support any suggestion that any fraud occurred in connection with the transfers from TIFF to TFT and the identification of loans covered by those transfers. Defendants also did not assert "fraud" as an affirmative defense to any of the claims that Plaintiffs asserted.

I cannot help but note that if Defendants really were worried about the possibility that someone else might claim ownership of the lender's rights the correct answer would have been to interplead the relevant funds. After all, Defendants admit that they have not repaid the sums that they borrowed. In any event, Plaintiffs have offered sufficient evidence to show that TFT acquired the lender's rights under the March 2014 Loan Agreement from TIFF, and Defendants admittedly have no evidence to the contrary.

### B. TFT's Ownership of the Lender's Rights Under the 2015 Loan Agreement

The documentation of TFT's ownership of the lenders' rights under the 2015 Loan Agreement is less complete, as Plaintiffs have acknowledged that they have not found an actual assignment agreement. However, Plaintiffs have provided evidence showing that STFF bought a 100% participation interest in that loan and that in doing so STFF provided the funds that were used to pay off a prior participation interest held by Bank Malta. STFF's participation interest was obtained from TFT, which is consistent with Plaintiffs' contention that TFT acquired the ownership of the lender's rights from TOF NV at the time the participation interests were sold.

More importantly, Defendants signed proposed contracts, issued board resolutions, prepared financial statements, made payments and entered into further discussions with TFT over loan modifications, all of which recognized TFT's ownership of the lenders' rights under the 2015 Loan Agreement. No other party has claimed ownership of those rights, and Defendants admit that they have no evidence suggesting that TFT did not acquire those rights or that the rights were actually owned by any other party. Defendants' quibbles over the fact that the STFF Participation Certificate incorrectly referred to a loan agreement dated "October 31, 2014," in this context, is not enough to raise a genuine issue for trial. Defendants' idle speculation about possible "fraud" similarly does not raise a genuine dispute for trial for the reasons stated above. Plaintiffs have

produced evidence (including Defendants' own prior admissions) that is sufficient to show that TFT owned the lender's rights under the 2015 Loan Agreement, and Defendants have admitted that they have no evidence to the contrary.

### C. TFT's Assignment to Plaintiffs

I have already explained in Part II above that there is no genuine dispute as to whether TFT assigned its rights to Plaintiffs. This is true regardless of whether the Fifth Amendment was effective. The Assignment Agreement plainly refers to the assignment of rights with respect to loans to Valle totaling $15,540,000, which is the total principal amount that admittedly was outstanding at the time. No other loans were outstanding that involved Valle or San Agustin, and so there are no other loans to which this assignment by TFT could have referred. Once again, Plaintiffs' evidence is sufficient to show that TFT assigned its rights to Plaintiffs, and Defendants admit they have no contrary evidence.

### D. The Valle Defendants' Arguments That "Subsequent Agreements" Bar the Alternative Claims

The Valle Defendants appeared to admit, in the answers that they filed to the Amended Complaint, that the Fifth Amendment had become effective. In fact, they argued that the claims asserted against the Valle Defendants were barred by the "subsequent agreements" of the parties [ECF No. 31, First Affirmative Defense], which the Court interpreted as meaning the fact that the Fifth Amendment substituted San Agustin as the obligor and (if effective) required a release of the Valle Defendants.

During the course of the summary judgment briefing the Valle Defendants (who are all affiliates of San Agustin) said that they no longer contended that the Fifth Amendment was effective, while acknowledging that at "earlier points" their position had been different. Tr., October 4, 2022, at 13; Tr., October 12, 2022, at 37. Nevertheless, the Valle Defendants have

continued to argue that they allegedly were "released" from their obligations by "subsequent agreements" among the parties. When the Court asked during oral argument just what "subsequent agreements" could have released the Valle Defendants in the absence of the Fifth Amendment itself, counsel to the Valle Defendants could not answer. Tr., October 4, 2022, at 15-17; Tr., October 12, 2022, at 37-41.

Notably, the Defendants all contend that the November 2019 version of the Fifth Amendment never took effect, and so they cannot rely on it (and its proposed extension of the maturity date) in support of their vague contentions that subsequent "agreements" limit or bar the Plaintiffs' claims. Nor could counsel identify any other enforceable "agreements" that would limit the ability to collect default interest. Counsel instead merely contended that the parties had various discussions, while acknowledging that he could not point to any specific documents or agreements (other than the Fifth Amendment itself) that limited the lender's rights in any way. *Id.*

### E. Whether a Default Notice Was A Prerequisite to the Borrowers' Obligations

The Valle Defendants argued that a "notice of default" was required before claims under the 2014 Loan Agreement and 2015 Loan Agreement could be pursued. However, each of those loans had matured. Paragraphs 7(a) and 7(g) of the 2014 Loan Agreement made clear that a failure to pay upon maturity was an automatic default. *See* Kennedy Decl., Ex. 9. Paragraphs 7(a) and 7(f) of the 2015 Loan Agreement included similar provisions. *Id.* Ex. 17. During oral argument the Defendants' counsel withdrew the contention that a notice of default was required. *See* Tr., October 12, 2022, at 27-28.

### F. Whether the Valle Subsidiaries' Guarantees Required Separate Demands

Section 2.1 of the guaranty of the 2014 Loan Agreement that the Valle Defendants executed stated that if the Borrower failed to pay any amount when due the Guarantors would pay the same

"upon receipt from the Lender of written demand for payment thereof."  Kennedy Decl., Ex. 12.
Section 2.1 of the Conditional Guaranty executed by San Agustin contains similar language.
Kennedy Decl., Ex. 11.  Defendants argue that these provisions required a "demand" for payment
that was separate from the pleadings in this case.  However, there is no requirement in the
guarantees that a "demand" for payment be made in any particular way or at any particular time,
other than that the "demand" must be in writing.  The alternative claims asserted in the Amended
Complaint plainly constitute a written demand for payment, and that satisfies any requirements in
the relevant guarantees.

### G.    Whether Replacement Notes Were Required

The Valle Defendants argued that TIFF, TFT and Plaintiffs could not assert rights under
the 2014 Loan Agreement because replacement promissory notes were not issued.  However,
section 10.1 of the 2014 Loan Agreement clearly permits an assignment of the lender's rights.  It
stated that the borrowers would supply replacement notes "at the request of the Lender," but there
is nothing in section 10.1 that required the Lender to ask for such replacement notes, or that made
the effectiveness of the assignment conditional upon the execution and delivery of replacement
notes.

### H.    Whether the Covid Pandemic Excused The Valle Defendants' Performance

The Valle Defendants have argued vaguely that they should be excused from some or all
of their obligations as a result of the emergency conditions associated with the Covid pandemic.
However, the obligations that were owed under the 2014 Loan Agreement and the 2015 Loan
Agreement were obligations to pay money.  The Valle Defendants offered no admissible evidence
of any kind showing how or why the Covid pandemic made it impossible for them to pay money,

or how or why the pandemic should excuse the Valle Defendants from any obligations that they owed.

> ## I. Whether the Guarantors' Obligations Followed the Assignments

At one point the Defendants argued that the guarantors did not consent to an assignment of the guarantees and that the various assignment documents did not reference the guarantees. However, the Court pointed out during oral argument that each guaranty stated expressly that it "followed" the relevant loan and therefore automatically applied to the benefit of any assignee of the lender's rights. The Defendants then withdrew their contentions on this point. *See* Tr., October 4, 2022, at 57-60; Tr., October 12, 2022, at 27.

## VI. TFT and Plaintiffs Did Not Waive Rights to Collect Default Interest

The Defendants contend that TFT and Plaintiffs did not immediately declare defaults, that they sent invoices that did not immediately seek default interest, and that these actions purportedly bar the collection of default interest. Defendants similarly argue that they "relied" on forbearance by the lenders and that they have vague "setoff" rights as a result of that reliance. However, section 10.12 of the 2014 Loan Agreement and section 9.12 of the 2015 Loan Agreement each plainly state that the lender's rights cannot be waived except in writing, and that no delay in the assertion of such rights shall constitute a waiver of such rights. These provisions are enforceable under New York law. *See Chase Manhattan Bank v Motorola, Inc*., 184 F. Supp. 2d 384, 395 (S.D.N.Y. 2002) (noting that clauses providing that a failure or delay in exercising rights does not preclude further exercise of such rights are "routinely enforced under New York law," *citing See CS First Boston v. Behar*, 1996 WL 384893, at *4 (S.D.N.Y. July 9, 1996)); *see also Renali Realty Group 3 v. Robbins MBW Corp.*, 259 A.D.2d 682, 686 N.Y.S.2d 855, 856 (2d Dep't 1999); *Indus. Window Corp. v Fed. Ins. Co*., 609 F. Supp. 2d 329, 339 (S.D.N.Y. 2009) ("[u]nder New York

law, however, where a contract requires any amendments to be evidenced by a writing signed by the parties, oral modifications to the contract are prohibited," *citing N.Y. Gen. Oblig. Law § 15–301(1); SAA–A, Inc. v. Morgan Stanley Dean Witter & Co.*, 281 A.D.2d 201, 203, 721 N.Y.S.2d 640 (1st Dep't 2001).

Defendants also argued that TFT and the Plaintiffs should be bound by the proposed extended maturity date that San Agustin suggested in November 2019. During oral argument, Plaintiffs confirmed that they would be willing to agree that the November 2019 version of the Fifth Amendment (and its proposed extension of the maturity date) was enforceable so long as Defendants were willing to do so. However, Defendants were not willing to do so. By Defendants' own reasoning the November 2019 proposed modification to the Fifth Amendment was never signed by TFT and it therefore never became effective. *Naderi v. North Short-Long Is. Jewish Health Sys.*, 135 A.D.3d 619, 620 (1st Dept. 2016) (where agreement required a signature to be effective and it was not signed, the agreement did not take effect).

What Defendants really want, through their assertion of these defenses, is to have their cake and to eat it too. They argue that none of the parties' actions or exchanges gave rise to agreements that bound the Defendants in any way after 2015, but somehow that the same actions and exchanges gave rise to agreements that barred TFT and Plaintiffs from collecting default interest. That contention is barred by the terms of the 2014 Loan Agreement and the 2015 Loan Agreement and (to the extent it is effective) by the Fifth Amendment, which incorporated the relevant "no waiver" provisions of the 2014 Loan Agreement.

## VII. Calculation of Amounts Owed

The Court asked the parties to submit their respective calculations of the amounts that would be owed if Plaintiffs were successful on their primary claims or on their alternative claims.

Plaintiffs contend that the amounts owed under the Fifth Amendment totaled $23,983,202.13 as of April 22, 2023, with additional interest accruing in the amount of $7,081.25 per day. Plaintiffs' calculation assumes that interest accrued at a non-default rate of 12.5% from October 1, 2019 until October 15, 2019 (the date on which TFT executed its copy of the Fifth Amendment); and then at a rate of 11.5% until October 31, 2019 (the specified maturity date); and thereafter at a default rate of 16.5%. At an earlier point in these proceedings Plaintiffs contended that additional interest had already accrued prior to October 1, 2019, and it is apparent from the calculations that Plaintiffs offered in support of their alternative theories that Plaintiffs believe that some additional interest was outstanding prior to October 1, 2019. However, Plaintiffs' updated calculations do not include such amounts with respect to the judgment they seek under their first cause of action (probably to avoid the delay and expense of attempting to resolve any disputes over pre-October 2019 accruals). The use of September 15, 2019 as the date on which interest declined to 11.5% (rather than 12.5%) also is favorable to San Agustin and actually results in a slightly lower interest calculation than would have been the case if San Agustin's signature date (October 28, 2019) were used as the effective date of the interest reduction.

Plaintiffs also contend they are entitled to recover legal fees and expenses totaling $2,340,052.78, but as explained below such matters are properly reserved for post-judgment proceedings.

San Agustin contends that if the Fifth Amendment was valid the outstanding debt as of March 31, 2023 should be only $19,943,671. San Agustin comes to this conclusion by asserting that no interest accumulated on the loans (even at the non-default rate) until April 2021. However, for the reasons stated above there is no contention that the Defendants have made that would support that result.

San Agustin also contends, in the alternative, that if the Fifth Amendment was valid, and if during the period February 1, 2020 through April 1, 2021 interest accrued only at the contract rate of 11.5% (rather than at the default rate), the debt owed would be $22,012,489.49. However, for the reasons stated above there is no valid reason why interest would have accrued at any rate other than the default rate after October 31, 2019. There is also no reason why interest would not have accrued prior to February 1, 2020. It is true that San Agustin made some payments at the end of 2019 and early 2020, but those are taken into account by an agreed credit of $604,829.12 that each party has applied in making its calculations.

The Court has reviewed and "reverse engineered" the parties' calculations and identified another difference in the methodologies that the parties used. San Agustin computed interest using a "365 day" basis whereas Plaintiffs computed interest using a "360 day" basis. The use of a "360 day" basis for the calculation of interest is common in the financial world; it means that the real interest that accrues in a given year is slightly higher than the nominal rate, because (a) the effective daily rate is determined by dividing the nominal rate by 360, but (b) interest is actually paid for 365 days (or 366 days during a leap year). *See Kreisler v. Kreisler, LLC v. Nat'l City Bank*, 657 F.3d 729, 732-32 (8th Cir. 2011); *Voitier v. First Nat'l Bank of Commerce*, 514 F. Supp. 585, 587 (E.D. La. 1981). In other words, the use of the "360 day" methodology results in a higher accrued interest calculation.

The Fifth Amendment incorporated the terms of the 2014 Loan Agreement, as it had been modified by prior amendments. Paragraph 2.4(b) of the 2014 Loan Agreement stated that interest "shall be computed on the basis of a year of three hundred sixty (360) days for the actual number of days elapsed . . ." Plaintiffs therefore have correctly used the "360 day" method in computing

45

interest; San Agustin's alternative methodology is not in compliance with the terms of the loan documents.

The parties agree that San Agustin is entitled to a credit of $604,829.12 representing amounts that Plaintiffs have already recovered from another account. The Court has recalculated interest through and including April 26, 2023 (the date prior to the date of this Decision). In doing so the Court has used (a) $15,540,000 as the outstanding principal amount, (b) an interest rate of 12.5% from October 1, 2019 through October 14, 2019, (c) an interest rate of 11.5% from October 15, 2019 through October 31, 2019; (d) a default interest rate of 16.5% from November 1, 2019 through April 26, 2023, (e) the 360-day calculation method, and (f) the foregoing credit of $604,829.12. The Court concludes that the total amount outstanding as of this date is $24,018,608.38. Judgment will be entered in favor of Plaintiffs for that amount.

The Court has not calculated the amount(s) that would be owed if the Fifth Amendment were not effective. It is not clear to the Court whether there are any disputes as to the date(s) and amount(s) of payments that were made prior to October 2019 with respect to the March 2014 Loan Agreement, which could affect the accrued interest calculations. The parties also only offered calculations of San Agustin's liability with respect to its Conditional Guaranty, and not as to amounts that Valle would owe under the 2015 Loan Agreement.

Plaintiffs' separate request for the recovery of attorneys' fees or other collection costs is properly sought through a post-judgment motion under Fed. R. Civ. P. 54(d), made applicable by Fed. R. Bankr. P. 7054. The entry of judgment is without prejudice to such a separate application.

## Conclusion

For the foregoing reasons, the Court will direct the entry of judgment in favor of Plaintiffs jointly and against defendant San Agustin in the total amount of $24,018,608.38, with interest to accrue from and after the entry of judgment at the applicable interest rate on federal judgments.

Dated:  New York, New York
      April 27, 2023

                            **s/Michael E. Wiles**
                            Honorable Michael E. Wiles
                            United States Bankruptcy Judge